IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, <br><br> Plaintiff, <br><br> vs. <br><br> VADNAIS CORPORATION, CAWELO WATER DISTRICT, STEADFAST INSURANCE COMPANY, CLARENDON AMERICA INSURANCE COMPANY, and LEXINGTON INSURANCE COMPANY, <br><br> Defendants. <br> _____/ | CASE NO. CV F 10-1669 LJO GSA <br><br> **SUMMARY JUDGMENT DECISION** <br> (Docs. 44, 45-47, 53) |

**INTRODUCTION**

This is a contribution action between plaintiff St. Paul Fire & Marine Insurance Company ("St. Paul") and, *inter alia*, defendants Steadfast Insurance Company ("Steadfast") and Clarendon American Insurance Company ("Clarendon"). St. Paul argues that it is entitled to contribution as a matter of law, because Steadfast and Clarendon failed to defend the carriers' mutual insured, Vadnais Corporation ("Vadnais"), in the underlying action despite having a duty to do so. Steadfast and Clarendon filed cross-summary judgment motions, arguing that they had no duty to defend Vadnais, because no "occurrence" causing "property damage" occurred during their policy periods. Steadfast and Clarendon further argue that any covered property damages were excluded under their policies, because they were the result of Vadnais' own work and business risk. For the reasons discussed below, this Court GRANTS judgment in favor of Clarendon and Steadfast and against St. Paul.

**BACKGROUND**

**The Underlying Action**

The underlying action, styled *Cawelo Water District v. Ameron International Water Transmission Group*, Kings County Superior Court case No. 07-203, is a construction defect lawsuit.

Cawelo Water District ("Cawelo") alleged that an eight-mile-long pipeline, built to transport hot wastewater through open land from a Chevron-Texaco oil field to a basin, was defective. The underlying action is based, in part, on the following undisputed facts:

Vadnais entered into a contract with Cawelo to construct and install the pipeline on March 16, 1995. The pipeline was built to handle more than 450,000 barrels of wastewater that were produced each day. The water was intended to be sold by Cawelo for agricultural use. Work began on the pipeline in 1995. A notice of completion, dated May 25, 1996, was recorded on August 14, 1996.

On April 5, 2005, Cawelo filed its initial lawsuit against Vadnais and three other defendants. The operative pleading asserted claims against Vadnais and others for strict products liability, breach of express warranty, breach of written contract, negligence, breach of implied warranty, indemnity, and res ipsa loquitur. Cawelo alleged that Ameron International Water Transmission Group ("Ameron") was in the business of inventing, designing, manufacturing, assembling, and selling C-303 pipe; Vadnais purchased the C-303 pipe from Ameron for use in the pipeline; the C-303 pipe purchased from Ameron for use in the pipeline was "defective and unsafe for its intended purpose by reason of defect in the design, manufacture, testing, and inspection"; and that such defects caused the pipeline to "fail, deteriorate, malfuction, and leak, allowing large quantities of produced water to escape." Cawelo further alleged that Vadnais furnished nonconforming pipe; was negligent and careless in the installation of the pipeline; and that such performance by Vadnais became apparent only after a failure of the pipeline was discovered. Cawelo's complaint alleges that "said breaches, due to their nature, only became apparent to [Cawelo] when the pipeline began to leak, deteriorate, malfunction and fail, commencing in March of 2004."

In the third amended complaint, Cawelo sought damages of not less than $8 million dollars, including "incidental and consequential damages, including property damages and payment of damages to third parties consisting of property and personal injury damage payments. Cawelo alleged the following damages: (1) pipeline repairs; (2) increased costs of pumping water to area farms; (3) cost of water due to the leaks; (4) loss of access to credit from Chevron; and (5) loss of use of the pipeline as an asset. Cawelo also alleged damages to third parties, including: (1) costs of settling the non-litigated claims by the Vignolo family regarding a 2005 flooding of their home and resultant displacement of their

2

tenants; and (2) costs of settling a lawsuit filed by Marc Essary, who alleged he was injured in 2006 when he drove his car into a sinkhole created by one of the pipeline failures; and

### **St. Paul Policy and Defense**

St. Paul received notice of Cawelo's claims and the underlying action on August 9, 2006. Thereafter, St. Paul provided a defense for Vadnais in the underlying action pursuant to commercial general liability insurance policy No. KK08300546 for the period between November 26, 1997 to February 1, 1999.

### **Tender Of Defense**

On January 25, 2007, St. Paul tendered the defense of Vadnais to Clarendon and Steadfast. On March 19, 2007, Vadnais re-tendered Cawelo's claims against Vadnais to Steadfast. On May 7, 2007, Clarendon declined coverage regarding Cawelo's claims against Vadnais. While initially sharing in the defense of Vadnais, Steadfast withdrew its defense on August 1, 2009.

### **Clarendon Policy and Denial of Coverage**

Clarendon issued a commercial general liability contract to Vadnais, policy No. TCN0698/94/0184 for the period between November 25, 1995 to November 25, 1996. The Clarendon policy provides in part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages.

The Clarendon policy provides that coverage applies to "bodily injury" and "property damage" provided:

> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in a "coverage territory" and, (2) The "bodily injury" or "property damage" occurs during the policy period.

"Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same harmful conditions." "Property damage" is defined as:

///

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

The Clarendon policy includes several exclusions, setting forth circumstances in which there will

be no coverage for "property damage." In particular, the Clarendon policy excludes coverage for "property damage":

> j. That particular part of any property must be restored, repaired or replaced because "your work" was incorrectly performed on it.
> k. "property damage" to "your product" arising out of it or any part of it.
> l. "property damage" to "your work" arising out of it or any part of it and including in the "products-completed operations hazard."
> m. "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>   (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work," or
>   (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

The policy defines "your work" as:

> a. Work or operations performed by you or on your behalf; and
> b. Materials, parts or equipment furnished in connection with such work or operations.
>
> "Your work" includes:
> a. warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work."
> b. The providing of; or failure to, provide warnings or instructions.

Clarendon denied coverage, asserting that there was no "occurrence" of "property damage" during the policy period. Clarendon's denial to defend is based on the allegations of the complaint, which alleges that the pipeline leaks and failures commenced in March 2004, years after the Clarendon policy had elapsed. Clarendon also denied tender based on an argument that Cawelo's claims solely concerned damages caused by the insured's own work, which are excluded from coverage under the policy.

**Steadfast Policy and Denial of Coverage**

Steadfast issued to Vadnais commercial general liability insurance contract policy No. SCO 229487700 for the period between November 25, 1996 to November 25, 1997. The Steadfast policy provides, in part:

///

> Subject to the exclusions, limitations, terms and conditions of the policy and in consideration of the premium stated in the declarations, the company agrees to pay on behalf of the named insured the ultimate net loss which the named insured shall become legally obligated to pay as damages for bodily injury or property damage caused by an occurrence to which this insurance applies, subject to the limits stated in the declarations.
>
> With regard to such insurance as it is afforded by this policy, the company shall have the

> right and duty to defend any suit against the named insured seeking damages on account of bodily injury or property damage, even if the allegations of the suit are groundless, false or fraudulent.

The Steadfast policy defines "occurrence" as:

> an accident that takes place during the period of coverage provided by the policy, including continuous or repeated exposure to substantially the same general harmful conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the named insured or the victim thereof.

"Property damage" is defined as:

> (1) Physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or
> (2) Loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

The Steadfast policy includes a "business risk" exclusion, which excludes from coverage "property damage (including the loss of use or property) to work performed by the named insured arising out of such work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith."

Steadfast denied coverage based on its position that there was no "occurrence" of "property damage" during the policy period. Steadfast argues that, according to the underlying complaint, the first break in the pipeline did not occur until March 10, 2004. Steadfast argues that even if the pipeline had begun to corrode and leak during the policy period, Cawelo brought no claim for damage to any third-party property occurring during the policy period. According to Steadfast, damage to the pipeline, constructed and installed by Vadnais, is excluded under the policy as Vadnais' business risk.

**Expert Reports**

St. Paul submits two expert reports to support its position that extrinsic evidence made clear that there was a possibility of damages during the policy periods of both the Steadfast policy and the Clarendon policy.

Richard O. Lewis, P.E. ("Mr. Lewis"), submits both a draft and a final report regarding the pipeline failures. In both of these reports, Mr. Lewis notes that a series of failures occurred in the pipeline between March 2004 and April 2006. Mr. Lewis opined that the results of his tests "confirm

5

1  a chronic pattern of pipeline deterioration and distressed conditions.  Those conditions developed during
2  an approximately 10 year service life of the pipeline prior to it being taken out of service and replaced."
3  Mr. Lewis concluded that the pattern of failures between March 2004 and April 2006 were "the result
4  of a symptomatic, chronic pattern of corrosion induced deterioration of the pipeline."

5  David Niebuhr, Ph.D., P.E. ("Dr. Niebuhr"), submits a December 2, 2011 declaration, which
6  contains his opinions regarding the timing and causes of the pipeline leaks.  In the declaration, Dr.
7  Niebuhr acknowledges that at "least one report states that the pipeline would have begun to corrode
8  immediately upon installation in the ground due to" a number of reasons.  Presumably, Dr. Niebuhr is
9  referencing Mr. Lewis' report.  Dr. Niebuhr opines that, according to this report, the "pipeline would
10 have begun leaking soon after the pipeline was put into use in May 1996 and water began to flow, due
11 in part to the fact that the pipeline was not designed or manufactured to carry water in that soil
12 environment, or to transport water with the temperature of 155" degrees.  In Dr. Niebuhr's opinion, "the
13 pipeline leaked water much sooner than March 2004, when the leak was first discovered."  Dr. Niebuhr
14 concludes that based "on review of documents from all parties there is strong evidence to support the
15 early failure of the pipeline."

16 **Procedural History**

17 St. Paul initiated this action against Clarendon, Steadfast and others for equitable contribution
18 and declaratory relief.  St. Paul alleges that Clarendon and Steadfast owed Vadnais a duty to defend in
19 the underlying action, because (1) the Cawelo complaint contains allegations that establish the potential
20 for coverage under the Clarendon and Steadfast policies and (2) extrinsic evidence in the case establishes
21 the potential for "body injury" and "property damage" that took place during the Clarendon and
22 Steadfast policy periods.  St. Paul alleges that as a result, Clarendon and Steadfast were obligated to
23 participate in Vadnais' defense in the underlying action, but failed to do so.  Because St. Paul paid all
24 costs in defending Vadnais, St. Paul alleges that it is entitled to reimbursement of its costs equivalent
25 to the fair and equitably proportionate share of the total defense cost.  St. Paul also seeks declaratory
26 relief that: (1) Clarendon and Steadfast had a duty to defend Vadnais in the underlying litigation; (2)
27 Clarendon and Steadfast have an equitable duty to pay a fair and proportionate share of the defense cots
28 incurred on behalf of Vadnais; (3) Vadnais' defense costs have been borne disproportionately by St.

1  Paul; and (4) Vadnais' defense costs should be equitably proportioned between St. Paul, Clarendon, and
2  Steadfast.

3   Clarendon and Steadfast filed summary judgment motions on January 9, 2012. St. Paul moved
4  for summary judgment on January 20, 2012. All three motions have been fully briefed. Having
5  considered the parties' arguments, exhibits (including those exhibits which are judicially-noticeable),
6  and the record, this Court found this motion suitable for a decision without oral argument. Accordingly,
7  this Court vacated the February 22, 2012 hearing pursuant to Local Rule 230(g) and issues the following
8  order.[1]

### STANDARDS OF REVIEW

10   Fed. R. Civ. P. 56 permits a "party against whom relief is sought" to seek "summary judgment
11  on all or part of the claim." In a summary judgment motion, a court must decide whether there is a
12  "genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398
13  U.S. 144, 157 (1970). A party seeking summary judgment/adjudication bears the initial burden of
14  establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317,
15  323 (1986). The moving party may satisfy this burden in two ways: (1) by presenting evidence that
16  negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving
17  party failed to make a showing of sufficient evidence to establish an essential element of the nonmoving
18  party's claim, and on which the non-moving party bears the burden of proof at trial. *Id*. at 322. "The
19  judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and
20  any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled
21  to judgment as a matter of law." Fed. R. Civ. P. 56(c). "If the party moving for summary judgment
22  meets its initial burden of identifying for the court those portions of the material on file that it believes
23  demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the
24  nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec.*

---

[1] This Court carefully reviewed and considered the record, including all evidence, arguments, points and authorities, declarations, affidavits, testimony, statements of undisputed facts and responses thereto, objections and other papers filed by the parties. Omission of reference to evidence, an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the evidence, argument, document, objection or paper. This Court thoroughly reviewed, considered and applied the evidence it deemed admissible, material and appropriate for summary judgment. This Court does not rule on evidentiary matters in a summary judgment context, unless otherwise noted.

7

*Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting Fed. R. Civ. P. 56(e)).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor, but "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968); *T.W. Elec. Serv.*, 809 F.2d at 631. The nonmoving party must "go beyond the pleadings and by her own affidavits, or by depositions, answer to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Fed. R. Civ. P. 56(e) requires a party opposing summary judgment to "set out specific facts showing that there is a genuine issue for trial." "In the absence of specific facts, as opposed to allegations, showing the existence of a genuine issue for trial, a properly supported summary judgment motion will be granted." *Nilsson, Robbins, et al. v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

## DISCUSSION

In the first cause of action, St. Paul seeks equitable contribution from Steadfast and Clarendon. In insurance coverage litigation, the purpose of equitable contribution is to equalize the common burden shared by co-insurers, and to prevent one insurer from profiting at the expense of others. *Maryland Cas. Co. v. Nationwide Mut. Ins. Co.,* 81 Cal. App.4th 1082, 1089 (2000). "It is the right to recover, not from the party primarily liable for the loss, but from a co-obligor who shares such liability with the party seeking contribution." *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App.4th 1279, 1293 (1998). The right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others. *Truck Ins. Exchange v. Unigard Ins. Co.*, 79 Cal. App.4th 966, 974 (2000). Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its co-insurers for equitable contribution when it has undertaken the defense or indemnification of the common insured. *Fireman's*

*Fund Insurance Co.*, 65 Cal. App.4th. at 1293. Equitable contribution permits the reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was equally and concurrently owed by the other insurers and should be shared by them pro-rata and proportionate to their respective coverage for the risk. In making its equitable determination a Court considers the nature of the claim, the relation of the insured to the insurers, the particulars of each policy and any other equitable consideration. *Truck Ins. Exchange*, 79 Cal. App. 4th at 974.

To recover on its claim for equitable contribution, St. Paul must establish that it and the defendant insurance carriers insured the same risk. If a defendant carrier does not have coverage for a particular underlying claim, that is a complete defense to equitable contribution. *Safeco Ins. Co. v. Sup. Ct.*, 140 Cal. App. 4th 874, 880 (2006). As the *Safeco* court explained:

> In an action by an insurer to obtain contribution from a co-insurer, the inquiry is whether the non-participating co-insurer "had a legal obligation. .. to provide [a] defense [or] indemnity coverage for the claim or action prior to [the date of settlement]," and the burden is on the party claiming coverage to show that a coverage obligation arose or existed under the co-insurer's policy. (citations omitted). This is what courts mean when they say they will not order a co-insurer to contribute to a loss that it had no obligation to pay under the terms of its policy (citation omitted).

*Id.* at 879-880 (brackets and ellipsis in original). Accordingly, St. Paul carries the burden to establish that Steadfast and Clarendon had a legal duty to defend Vadnais in the underlying action.

St. Paul argues that both co-insurers had a duty to defend because the property damage began to occur during the policy period under both policies. St. Paul contends that the potential for indemnity was clear both from the allegations of the underlying complaint and from extrinsic evidence later revealed through expert reports.

Steadfast and Clarendon both argue that they had no duty to defend Vadnais, because the allegations of the complaint made clear that the pipeline began to leak, deteriorate, malfunction and fail in March 2004, many years after the policies expired. Additionally, Steadfast and Clarendon each argue that the damages to the pipeline were excluded under each policy.

**Duty to Defend**

The Court shall first consider whether the duty to defend arose before considering whether an exclusion applied. Under California law, an insurer's duty to defend against litigation brought against

Case 1:10-cv-01669-LJO-GSA   Document 102   Filed 03/06/12   Page 10 of 19

the insured by a third party arises whenever the insurer ascertains facts that give rise to even the potential for indemnity under the policy. *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654 (2005). An insurer "must defend a suit which *potentially* seeks damages within the coverage of the policy." *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 (1966) (italics in original). "The duty to defend is determined by reference to the Policy, the complaint, and all facts known to the insurer from any source." *Montrose Chemical Corp. v. Superior Court*, 6 Cal. 4th 287, 300 (1993); *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993). To determine whether an insurer's duty to defend has been triggered, the Court considers the following:

> If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance.

*Scottsdale Ins. Co. v. MV Trans.*, 36 Cal. 4th 643, 655 (2005). "The insured need only show that the underlying claim may fall within policy coverage, the insurer must prove it cannot." *Montrose*, 6 Cal. 4th at 300. "Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." *Montrose*, 6 Cal. 4th at 300; *Horace Mann*, 4 Cal. 4th at 1081.

"When determining whether a particular policy provides a potential for coverage," the Court is "guided by the principle that interpretation of an insurance policy is a question of law." *Powerine Oil Co., Inc. v. Superior Court*, 37 Cal.4th 377, 390 (2005). "The insurer is entitled to summary adjudication that no potential for indemnity exists ... if the evidence establishes as a matter of law that there is no coverage." *Id.* (internal citations and quotations omitted).

The "fact that one insurer may owe a duty to provide a defense will not excuse a second insurer's failure to honor its separate and independent contractual obligation to defend." *Emerald Bay Community Ass'n v. Golden Eagle Ins. Corp.*, 130 Cal.App.4th 1078, 1089 (2005).

///

### "March 2004 Allegation"

Steadfast and Clarendon argue that no duty to defend Vadnais in the underlying litigation arose,

10

because the allegations of the complaint clearly establish that no damages occurred until March 2004. The Clarendon policy covered the time period of November 25, 1995 to November 25, 1996. The Steadfast policy covered the time period of November 25, 1996 to November 25, 1997. According to the operative pleading in the underlying action, "the pipeline began to leak, deteriorate, malfunction and fail, commencing in March of 2004." Based on these undisputed facts, Clarendon and Steadfast submit that they had no duty to defend Vadnais.

St. Paul argues that the allegations of the complaint raised the potential for indemnity, because the allegations establish a process occurring over time. St. Paul contends that Clarendon and Steadfast focus exclusively on the allegation that the pipeline began to "leak, deteriorate, malfunction and fail, commencing in March of 2004," while ignoring the fact that "deterioration" does not occur instantaneously. St. Paul argues that because the pipeline was buried eight feet underground, the allegation that the first discovery of a pipeline failure in March 2004 makes it apparent that the pipeline had begun to deteriorate and leak well before March 2004. St. Paul argues that the allegations of the underlying complaint made clear that there was a continuing and progressive process of deterioration of the pipeline and that, therefore, there was a possibility of damage occurring from the date of installation of the pipeline.

This Courts agrees with St. Paul that the allegations of the complaint raised at least the potential for coverage. Although the complaint alleges that the pipeline "first began to leak, deteriorate, malfunction, and fail in beginning in March of 2004," it further alleges that the breaches or negligent acts "due to their nature, only became apparent" in March of 2004. The former language supports Clarendon and Steadfast's positions that the occurrence took place in 2004; however, the latter language supports St. Paul's position that the acts causing the damages were only discovered in March 2004. When read into context, the allegations raise at least the potential that damages arose prior to when they were first discovered in March 2004. The third amended complaint asserts a breach of written contract claim against Vadnais based on, *inter alia*, the following allegations:

///

> On or about March 16, 1995...Vadnais entered into a written Contract Agreement for the construction of plaintiff's...Pipeline...That as part of said Contract Agreement, defendant VADNAIS...agreed to furnish all materials, equipment, tools, and labor and to construct

> the...Pipeline in a good and workmanlike manner as required by the Contract Agreement...Plaintiff is informed and believed that the foregoing was breached by defendant by furnishing a defective nonconforming pipe and by its negligent and careless installation of said pipe. Said breaches, due to their nature, only became apparent to plaintiff when the pipeline first began to leak, deteriorate, malfunction and fail, commencing in March of 2004.

TAC, 30-33. Similarly, in its negligence claim against Vadanis, Cawelo alleges that Vadnais "knew or should have known that the Pipeline was not properly installed or constructed" and Vadnais "negligently and carelessly installed, constructed, and inspected" the defective pipe, "causing the pipeline to leak, deteriorate, malfunction, and fail." TAC, 36-37. These allegations make clear that Cawelo is alleging a pattern of defective materials and defective installation that caused a latent leak that only became apparent in March 2004.

Under similar facts and nearly identical insurance contract terms, courts have found that the duty to defend was triggered. For example, in *Pepperell v. Scottsdale Ins. Co.*, 62 Cal. App. 4th 1045, 1055 (1998), the court found a duty to defend arose based on allegations of defective design and construction of a home, even though the damages were not manifested until years after the policy period expired. The court reasoned: "The clear implication of the complaint is that there existed–at least *potentially*–a covered event, i.e., a continuing and progressively deteriorating process which began with defective design and construction admittedly *within* the pertinent policy." *Id*. (emphasis in original). Similarly, this Court finds that the third amended complaint raised the potential for a covered event during both the Clarendon and Steadfast policies. Because it was alleged that the pipeline had defective design and installation in May 1996, that it corroded and deteriorated, and that because of the nature of the injuries, the damages were only discovered until later, there was a potential that damages arose during the Clarendon policy(November 25, 1995 to November 25, 1996) and the Steadfast policy (November 25, 1996 to November 25, 1997). Accordingly, this Court finds that the allegations of the complaint established a "continuous injury," which triggered the duty to defend for both Clarendon and Steadfast, "unless there are exculpatory facts, such as policy exclusions on the duty to defend." *Pepperell*, 62 Cal. App. 4th at 1055.

The expert report and declaration support this conclusion. In 2006, Mr. Lewis opined that the results of his tests "confirm a chronic pattern of pipeline deterioration and distressed conditions. Those

1  conditions developed during an approximately 10 year service life of the pipeline prior to it being taken
2  out of service and replaced." In 2011, Dr. Niebuhr concluded that based "on review of documents from
3  all parties there is strong evidence to support the early failure of the pipeline." These opinions support
4  the possibility that damages began to occur shortly after the installation in mid-1996. Steadfast and
5  Clarendon point out that neither expert explicitly states that damages arose during their respective policy
6  periods. This position ignores, however, the applicable standards. "The insurer is entitled to summary
7  adjudication that no potential for indemnity exists ... if the evidence establishes as a matter of law that
8  there is no [potential for ]coverage." *Id*. *Powerine Oil*, 37 Cal.4th at 390. Here, neither Steadfast nor
9  Clarendon provide evidence that there is *no* potential of damages occurring during the policy period.
10 On the other hand, the allegations of the third amended complaint and the expert reports provided by St.
11 Paul establish at least a potential for damages during the respective policy periods.

### Damages During the Policy Periods

13 While there was a potential for a continuing injury during the policy periods, the Court must next
14 determine what injury, if any, potentially occurred during that policy periods. Steadfast and Clarendon
15 argue that although the pipeline may have been defective during the policy periods, there was no
16 *damages* to the pipeline or others until March 2004. Under the terms of these policies, "the occurrence
17 of bodily injury or property damage during the policy period is the operative event that triggers
18 coverage." *Montrose II*, 10 Cal. 4th at 668. According to this well-settled rule, it is the property damage
19 that must occur during the policy period that triggers coverage. But Steadfast and Clarendon argue that
20 no damages arose for the pipeline repairs, loss of use of the pipeline, or from the third-party lawsuits
21 after the manifestation of the loss in March 2004.

22 The underlying complaint asserted various types of damages, including: (1) pipeline repairs; (2)
23 increased costs of pumping water to area farms; (3) cost of water due to the leaks; (4) loss of access to
24 credit from Chevron; (5) loss of use of the pipeline as an asset; (6) costs of settling the non-litigated
25 claims by the Vignolo family regarding a 2005 flooding of their home and resultant displacement of their
26 tenants; and (7) costs of settling a lawsuit filed by Marc Essary, who alleged he was injured in 2006
27 when he drove his car into a sinkhole created by one of the pipeline failures.

28 As explained above, St. Paul cannot rely on alleged damages that occurred *after* the policy period

13

expired. These damages include the loss of access to credit by Chevron, which did not occur until after the March 2004 failures, and damages to third parties, including: (1) costs of settling the non-litigated claims by the Vignolo family regarding a 2005 flooding of their home and resultant displacement of their tenants; and (2) costs of settling a lawsuit filed by Marc Essary, who alleged he was injured in 2006 when he drove his car into a sinkhole created by one of the pipeline failures. Damages related to the increased costs of pumping water to area farms area also not covered, as they were not alleged to have taken place until after the March 2004 leaks were discovered. Accordingly, St. Paul cannot rely on these damages to establish that duty to defend was triggered.

The damages that had a potential to have occurred during the policy period were damages to the pipeline and the loss of the water. Based on the allegations of the complaint, damages to the pipeline, including the corrosion, could have occurred during the policy periods. In addition, water could have leaked out of the defective pipeline during the policy periods. Accordingly, these damages could have occurred during the policy period.

## Whether Loss of Water is "Property Damage"

The parties dispute whether the loss of water constitutes "property damage" under the policies. Steadfast and Clarendon argue that the loss of water does not constitute "property damage" as defined in the policies. The Steadfast policy defines "property damage" as follows:

> (1) Physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or
> (2) Loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

The Clarendon policy defines "property damage" as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

Both parties point out that the third amended complaint sought damages for the replacement of the lost water, not damages based on the loss of use of the water. Both parties point out that under the law, there is a difference between damage to property and the loss of property. Indeed, "'conversion' is not 'property damage.'" *Collin v. American Empire Ins. Co.*, 21 Cal. App. 4th 787, 817 (1994).

St. Paul argues that the policies insured against the loss of the water. Relying on *Watts Industries, Inc. v. Zurich American Ins. Co.*, 121 Cal. App. 4th 1029, 1041 (2004), St. Paul points out that "[w]ater becomes personal property when contained in artificial courses or conduits." *Id*. While *Watts* stands for the position that water may be tangible property, *Watts* does not establish that the loss of the water constitutes property damage pursuant to each policy. In *Watts*, the water was "injured" or "damaged" because it was contaminated by a pollutant. The court found that the contamination of the water constituted damage to the physical property, thereby falling within the definition of "property damage" under the policy. This case is distinguishable, however, because Cawelo did not assert an injury to the water. That is, Cawelo did not claim that the water was contaminated or otherwise injured. Rather, Cawelo claimed damages for the loss of water. Thus, *Watts* provides no guidance on the relevant issue in this case; to wit, whether the "property damage" provision of the general liability policies covered a loss of water through leakage from a pipeline.

Each policy limited coverage to "property damage." Property damage was defined as "physical injury to tangible property" which included the "loss of use" of tangible property. Water is "tangible property," according to *Watts*. Whereas the definition of "property damage" included in the Clarendon and Steadfast policies would cover damages related to the loss of use of the water, those policies do not insure against the loss of water. This Court arrives at this conclusion based on the plain language of the terms of the policy and the courts' interpretation thereof.

In the *Cawelo* complaint, however, no allegations assert *injury* to the water or the loss of its use. Cawelo was not alleged to have used the water in any capacity. Cawelo had no use for the water while it was in the pipeline, and sought no damages for loss of its use. Instead, Cawelo alleges damages based on the conversion of the water. Conversion is defined as the "taking or deprivation of property." *Collin*, 121 Cal. App. 4th at 817. Cawelo alleged damages for the replacement value of the lost water that was meant to be transported through the pipeline for sale and sought damages for the replacement value of the water it lost.

Based on the allegations of the complaint, the loss of water was not covered as "property damages" under either the Clarendon or Steadfast policies. Had the parties contemplated coverage for "loss of property," that provision would have been written into each policy. Instead, the parties agreed

15

to terms that covered "property damage." But because loss of water is not included in the definition of "property damage," those damages were not covered under the policy. Accordingly, and pursuant to the allegations of the underlying complaint, there was no "property damage" under the terms of each policy, based on the loss of the water.

### Exclusions

Coverage under each policy was triggered based on the covered damages that occurred during the policy periods. Most of the damages alleged did not arise until after the policy periods expired. For example, the damages to the third parties occurred after the pipeline leaked in March 2004. Also, as discussed above, the loss of water was not a covered damage that would give rise to coverage under the terms of the Clarendon or Steadfast policies. Based on the allegations of the complaint and extrinsic evidence, however, there was a potential for injuries to have occurred to the pipeline during the policy periods. The pipeline may have been corroding and deteriorating shortly after installation. Accordingly, Steadfast and Clarendon had a duty to defend Vadnais (and therefore owe equitably contribution to St. Paul), unless applicable exclusions applied.

Exclusions are narrowly construed and must be proven by the insurer. *See Collin v. American Empire Ins. Co.*, 21 Cal. App. 4th 787, 802-03 (1994). Clarendon contends that the damages are excluded pursuant to the "your product" exclusion under the policy. Steadfast argues that the damages were excluded under the business risk exclusion. The Court considers each exclusion below.

### Clarendon's Exclusions

The Clarendon policy excludes coverage for "property damage" under the following circumstances:

> j. That particular part of any property must be restored, repaired or replaced because "your work" was incorrectly performed on it.
> k. "property damage" to "your product" arising out of it or any part of it.
> l. "property damage" to "your work" arising out of it or any part of it and including in the "products-completed operations hazard."
> m. "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>     (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work," or
>     (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

The policy defines "your work" as:

      a. Work or operations performed by you or on your behalf; and
      b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:
a. warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work."
b. The providing of; or failure to, provide warnings or instructions.

The policy defines "your product" as "a. Any goods or products, other than real property, manufactured, sold, handled, distributed, or disposed by: (1) You."

     St. Paul argues that this exclusion is inapplicable, because "your product" does not include "real property." St. Paul argues that the pipeline constituted "real property" under California real property law because real property consists of "that which is affixed to the land. Cal. Civ. Code §658. "A thing is deemed to be affixed to land when it is attached by its roots...or imbedded in it...or permanently resting upon it...or permanently attached to what is thus permanent[.] Cal. Civ. Code §660. St. Paul contends that because an exception to the "your product" exclusion includes real property, the injuries to the pipeline are excepted from the exclusion.

     St. Paul's argument ignores the "your work" exclusion, the exclusion upon which Clarendon's arguments are based. The Clarendon policy excludes "[t]hat particular part of any property must be restored, repaired or replaced because 'your work' was incorrectly performed on it." Clarendon correctly argues that Cawelo sought damages to repair or replace the pipeline and that the pipeline needed to be repaired or replaced based on Vadnais' own work, which was allegedly negligent and deficient. These facts are undisputed. Based on this exclusion, which does not rely on a definition of "your product," the alleged damages to the pipeline was excluded from coverage under the Clarendon policy.

     Because the damages to the pipeline were excluded from coverage, and no other covered damages could have occurred during the policy period, Clarendon has established that it is entitled to judgment as a matter of law in its favor. This Court finds that Clarendon owed no legal duty to Vadnais under its policy. Accordingly, St. Paul is not entitled to equitable contribution or declaratory judgment on its claim against Clarendon.

### Steadfast's Exclusions

     The Steadfast policy includes a "business risk" exclusion, which excludes from coverage "property damage (including the loss of use or property) to work performed by the named insured arising

out of such work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith." Steadfast argues that this exclusion precludes coverage for any damage to the pipeline that may have occurred during Steadfast's policy period.

Steadfast maintains that "[general liability policies] are not designed to provide contractors and developers with coverage against claims their work is inferior or defective. The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer." *Maryland Cas. Co. v. Reeder*, 221 Cal. App. 3d 961, 967 (1990). Based on these accepted purposes, "liability coverage comes into play when the insured's defective material or work causes injury to property other than the insured's own work or products." *F & H Construction v. ITT Hartford Ins. Co.*, 118 Cal. App. 4th 364, 372 (2004).

This Court agrees that under this exclusion, Cawelo's alleged damages related to the pipeline defect are excluded from coverage. Defective installation of a product is not property damage under a general liability policy. *New Hampshire Ins. Co. v. Viera*, 930 F.2d 696, 700 (9th Cir. 1991). The cost of correcting the insured's defective work is an economic loss, not "physical injury" to property. *F&H Const.*, 118 Cal. App. 4th at 371-72 . The excluded damages include pipeline repairs and loss of use of the pipeline as an asset. St. Paul cannot rely on these excluded damages to trigger the duty to defend.

Because the damages to the pipeline were excluded from coverage, and no other covered damages could have occurred during the policy period, Steadfast has established that it is entitled to judgment as a matter of law in its favor. This Court finds that Steadfast owed no legal duty to Vadnais under its policy. Accordingly, St. Paul is not entitled to equitable contribution or declaratory judgment on its claim against Steadfast.

**CONCLUSION AND ORDER**

For the foregoing reasons, this Court:

1. DENIES St. Paul's summary judgment motion;
2. GRANTS Clarendon's summary judgment motion;

1   3.   GRANTS Steadfast's summary judgment motion; and
2   4.   DIRECTS the clerk of court to enter judgment in favor of Clarendon and Steadfast and
3        against St. Paul.
4                           IT IS SO ORDERED.
5   **Dated:   March 5, 2012**                    **/s/ Lawrence J. O'Neill**
                                                  UNITED STATES DISTRICT JUDGE